A. SYME, Administrator, et als v. THOMAS BADGER, Administrator, et als.

*Executor—Qualification—Retainer—Election—Devastavit.*

1. Where an executor proves the will, he cannot elect to take against the will. So where a testator was indebted to the person he appoints his executor and leaves certain property to the executor in payment of the debt, which proved to be of less value than the amount of the debt, the executor, after proving the will, cannot elect to assert his rights as a creditor and retain his debt out of other assets of the estate.

2. It is immaterial that the executor acted under a mistaken idea of the legal consequences of proving the will.

3. An executor is only required to act in good faith and with reasonable care in the management of the estate.

4. Where an executor did not collect a debt, under the impression that it belonged to him personally, he will only be held accountable to the estate for the part of such debt as he actually collects.

5. Where an executor takes a security in his own name for a debt due the estate, it is not, in the absence of fraud and improper purpose, a devastavit.

(*Mendenhall* v. *Mendenhall*, 8 Jones, 287; *Jones* v. *Gerock*, 6 Jones Eq., 190; *Harrington* v. *McLean*, Phil. Eq., 258; *Isler* v. *Isler*, 88 N. C., 581; *Deberry* v. *Ivey*, 2 Jones Eq., 370; *Nelson* v. *Hall*, 5 Jones Eq., 32; *Patterson* v. *Wadsworth*, 89 N. C., 407; *Torrence* v. *Davidson*, *ante*, 437, cited and approved).

CIVIL ACTION, heard on exceptions to the report of a referee, before *Avery, Judge,* at February Term, 1884, of WAKE Superior Court.

There was judgment for the plaintiff, and the defendant appealed.

*Messrs. J. W. Hinsdale, Battle & Mordecai* and *John Devereux, Jr.,* for the plaintiffs.

*Messrs. Gatling & Whitaker,* for the defendants.

SMITH, C. J.   George E. Badger died in the year 1866, having, in October, 1859, made his will duly attested and in form to pass his real and personal estate, to which, in December, 1860, he annexed a codicil similarly executed, which his surviving widow, Delia Badger, nominated sole executrix, caused to be proved in the proper court and letters testamentary to issue to her.

The provisions of the will, so far as they are pertinent to the inquiries which the appeal requires us to make, and contained in the first and second clauses thereof, are as follows:

In the first place—"In the marriage settlement between my wife and myself, made just before our marriage, mention is made of bonds amounting to the sum of $15,119, but on ascertaining the state of accounts between her and the late Alfred Alston, who was executor of General Williams, and had acted as her agent, this sum was found subject to a deduction of $1,419, due him, so that the net amount receivable thereon was but $13,660.   To this are to be added a sum received of hers from the Clerk of the Supreme Court in a suit in equity, and other sums amounting to about $1,500, making the sum for which I am accountable to her, $15,160.

"Out of this I have purchased for her, and at her request, negro woman Catharine, at the price of $650; also, I have purchased the part of lot No. two hundred and ten (210), on which my office stands, of Thomas D. Hogg and George W. Mordecai for the price of $800, the residue of the said lot having belonged to her before our marriage and being embraced in our marriage settlement, leaving the sum of $13,710 to be otherwise accounted

for. I have made investments in the stock of the Bank of the State and the Bank of Cape Fear, sometimes at some advance on the nominal value of the shares, and also in bonds. Of the stock, forty shares in the Bank of Cape Fear were subscribed and now stand in the name of my wife, and will, of course, be hers without any bequest from me.

"Now, therefore, in payment and discharge of what I do owe to my wife, I devise and bequeath to her, her heirs, executors and administrators, sixty shares of stock standing in my name in the Bank of Cape Fear, besides and in addition to the said forty shares, the portion of the said lot No. 210, in the city of Raleigh, purchased by me of the said Hogg and Mordecai, and three thousand seven hundred dollars in cash or bonds."

Secondly:—"Under a deed made by my late wife Mary and myself to Thomas P. Devereux, and a deed from him to me, made in the latter part of the year 1834, or beginning of 1835, her share in certain lands descended from or devised by her father, Col. William Polk, were conveyed to me in trust for myself for life, remainder to my children of whom she was the mother, with a full power to me to sell any or all of the said lands, making such other investments as I might deem best, to be to the same uses, as will appear by reference to the said deeds now recorded or registered in Tennessee where the lands were situated. These lands being at a distance from me, constantly liable to depredations as well as to loss of title by adverse possession, I deemed it best to sell, and by the return of John H. Rill, the agent who made the sales, it appears that they brought in the whole a little less than $15,000. I have from time to time invested these proceeds in bank stock purchased at a large premium, and in bonds. The Bank of the State being about to wind up, in which these investments were chiefly made, in settlement of this fund I do give and bequeath to my dear daughters, Catharine, wife of Wm. H. Haigh, Esq., and Sallie, wife of Montford McGehee, Esq., only children of my said late wife Mary, each fifty shares in the capital stock of the Bank of North

Carolina, subscribed by me and in my name, the said stock to be paid for out of my estate, and to each of my said daughters I also bequeath three thousand dollars in cash or bonds."

Upon the coming in of the answer, an order of reference with consent of parties was entered at January Term, 1880, and the appointed referee directed to "take and state an account of the assets and effects of the said George E. Badger, deceased, that came or ought to have come into the hands of the executrix," &c., and what disposition has been made of them by her or her administrator, and to inquire and report to whom shall be paid such as have come or may come into the hands of the plaintiff, the administrator *de bonis non,* &c.

The referee proceeded to take evidence on the subject-matters of the reference, and has reported the same with his findings of fact and law, embodied in a series of accounts submitted with the report. The plaintiff filed several exceptions, most of which were sustained, and, upon a recommittal of the report, the account was reformed in accordance with the rulings of the court. The defendant's exceptions were overruled, and judgment being rendered, the defendant Thomas Badger, as administrator, appealed to this court.

The first two conclusions of law submitted by the referee and so numbered are in these words :

1. That Delia Badger, the executrix of George E. Badger, deceased, and intestate of Thomas Badger, administrator, having qualified under the will of her testator, containing a legacy stated to be in satisfaction and discharge of the debt due to her by him, thereby in law accepted and became bound by its provisions, and that she thereby waived the right to retain the amount of her debt out of the assets except as directed by the will.

2. That the plaintiffs McGehee and Haigh having never mentioned to the executrix, the matter of the legacies left to them, or made any demand on her for them, and knowing that she was applying the estate to her support, and being willing that she should do so, ought to be taken as assenting to the delay in col-

lecting the McIlhenny and Taylor debt (originally due from one Miller), and to the consequent risk, and that the executrix ought not to be charged with the excess of the debt above the amount actually received thereon.

The defendants' exception to the referee's first conclusion was overruled. The plaintiffs excepted to the second and were sustained, whereby the estate of the intestate of the appellant is made responsible for the full nominal value of the Miller debt.

These rulings constitute the case on appeal, and in order to their being properly understood and determined, require an examination of the facts applicable to each, and as found by the referee they are contained in the sixth clause of his series of findings of fact. Upon an examination of the evidence reported, we think it fully sustains the findings of the referee, which are as follows:

"6. That the assets which came to the possession of the executrix were as follows: (1) A note of John and Thomas P. Devereux, who were subsequently declared bankrupts. The debt was duly proven against the estate of the debtors and small dividends were at various times received therefrom as charged in the account, No. 1, hereto annexed. (2) A note for $............ against Thomas Miller and sureties. This debt being considered unsafe, Miller was required to execute a new note, with other sureties (Thomas McIlhenny and John D. Taylor). On said new note suit was brought by Mrs. Delia Badger, and judgment obtained thereon, with the understanding that a note secured by mortgage on the lands of McIlhenny and Taylor, in Brunswick county, N. C., should be substituted for the judgment, the lands being ample security at that time, for the debt. This was done, and in 1871 the lien of the mortgage upon the land conveyed therein by McIlhenny was released, with assent of Taylor and wife, and a new mortgage taken upon other lands of McIlhenny of greater value than those released, the transfer being made only after careful investigation as to its propriety and as to the value of the lands, by a skilled and careful attorney. The mortgages were made to Mrs. Delia Badger. The note secured by them was for

$6,650, bearing 8 per cent. interest, payable semi-annually and dated January 1, 1870. Suit for the foreclosure of the mortgage was instituted by the defendant Thomas Badger, administrator, after the death of Mrs. Badger, in 1876, and judgment obtained thereon at Fall Term, 1878. The lands were sold on December 6th, 1880, for two thousand dollars ($2,000). On said note, previous to the sale of the lands, there had been paid the said Delia the amounts set forth in the debit side of account No. 1. The judgment taken in 1867 was substituted by the mortgage, for the reason that the principal and interest of the debt became thereby a principal sum, bearing interest at a greater rate, to-wit: 8 per cent. (instead of 6 per cent.), and payable semi-annually. The mortgage was not foreclosed before 1876, for the reason that the lands were regarded as ample security, the interest was paid with reasonable promptness by the debtors, and Mrs. Badger did not want the principal sum, and no demand for the payment of the legacies was ever made by the plaintiffs, McGehee and Haigh, and she, Mrs. Badger, considered herself entitled to the whole debt and its proceeds. After the foreclosure suit the lands were not sold earlier than 1880, for the reason that on account of the depreciation of real estate values near Wilmington, where the lands were situated, there was a well grounded fear that the lands decreed to be sold would not sell for enough to pay the debt, and the administrator of Mrs. Badger was not able to bid in the property, and for the further reason that the administrator of Mrs. Delia desired the administrator *de bonis non* of George E. to take control of the judgment and sale, he having been advised that the judgment belonged to the estate of George E. (3) Parts of lots 237 and 253 in the plan of the city of Raleigh, N. C., which were sold to Mrs. S. G. Ryan by Mrs. Delia Badger, in 1871, for $2,500, a fair price, on which there were payments of interest as set out in the debit side of the account No. 1. In 1876 the lots were sold under mortgage to, or the debt assumed by, D. M. Carter. (4) Part of the lot 210 plan of the city of Raleigh, N. C., mentioned in the second clause of

George E. Badger's will, and devised therein to said Delia his wife and executrix."

The bank stock bequeathed by the testator, whatever may have been its value at the time of the making of the will, and, in the absence of any suggestion to the contrary, as well as from the testator's own evident estimate, we infer it to have been at least of par value, became by subsequent events wholly worthless at the death of the testator and when the executrix assumed her office.

The residuary clause, following some minor bequests of a slave and books, gives what remained of the estate to his wife in absolute property.

Under this clause she has made sale of certain lots, numbered 237 and 253, or rather parts of them, to the wife of S. G. Ryan for $2,500, on credit, the money due from which came afterwards into the hands of said D. M. Carter as administrator *de bonis non*, and has been accounted for by him. With these explanations we proceed to consider the exceptions brought up.

1. The effect of the acceptance of the trusts of the will by the executrix and her proceeding to execute them.

In *Mendenhall* v. *Mendenhall*, 8 Jones, 287, the qualification of the testator's wife as executrix, notwithstanding the subsequent entry of her dissent, was held to debar her right of dower in his lands, and the Chief-Justice, in giving expression to the general principle, uses this language: "The act of qualifying as executrix, and undertaking upon oath to carry into effect the provisions of the will, is irrevocable. She cannot now renounce and discharge herself from the duties thereby assumed. This is settled law."

The correctness of this ruling was re-affirmed at the next term by the same Judge in *Jones* v. *Gerock*, 6 Jones Eq., 190, wherein he says: "If the plaintiff had not entered her dissent in the State of Alabama, *but had taken under the will* the lands devised to her in that State, and had then come here and entered her dissent and claimed dower, we are inclined to the opinion that she

would not have been entitled to it, because, having taken under the will, she would not be allowed to take against the will here, according to the doctrine established in *Mendenhall* v. *Mendenhall.*"

In the subsequent case of *Harrington* v. *McLean*, Phil. Eq., 258, a marriage contract had been made wherein certain slaves were secured to the wife for life and remainder to her children, and in disregard of it, the surviving husband bequeathed them to his children, the offspring of a previous marriage, and appointed two executors who qualified, one of whom was the husband of the only child of the second wife, and who, when he accepted the trust, was ignorant of the existence of the contract. It was insisted against a bill filed for a specific performance of the ante-nuptial agreement, that the executor husband had precluded himself from disturbing the provisions of the will by accepting the office. In answer to this argument, the same eminent judge distinguishes the cases, and confining the former to claims for some interest derivable from the testator, such as dower and distributive shares, says, "For such claims being under the husband, were inconsistent with the act of qualifying as his executrix. But Harrington is not seeking to set up a claim *under* his testator, but is seeking to set up a claim for his wife *against* the testator, of which claim he had no notice until after he had qualified," &c. The principle deducible from the decisions, is that the undertaking assumed by an executor is to carry out all the provisions of the will, as far as lies in his power, but this does not obstruct the enforcement of a liability incurred by the deceased in his life-time, unknown when the trust was accepted, and, therefore, not constituting a case of election. But when beyond this, any gift of the testator is accepted or benefit voluntarily received under the will, it involves a surrender of all claim to property disposed of in the instrument; in other words one cannot take under a will and in opposition to it.

The rule is thus stated by the Lord Chancellor in *Thellusson* v. *Woodford*, 13 Ves., 219, and referred to with approval by this

court in *Isler* v. *Isler*, 88 N. C., 581 : " If a testator intending
to dispose of his property, and making all his arrangements under
the impression that he has the power to dispose of all that is the
subject of his will, mixes in his disposition property that belongs
to another person, or property as to which another person has a
right to defeat his disposition, giving to that person an interest
by his will, that person *shall not be permitted to defeat the dis-
position where it is in his favor, and not take under the will.*"

A gift intended to be in satisfaction of a debt due the legatee,
will put the legatee to an election. *Theobald on Wills*, 82. And
it is equally clear that a mode of payment prescribed in the will,
when a gift to the creditor is also contained in it which is
accepted, involves an assent to the directed means of paying the
debt.

In *Worthington* v. *Wigenton*, 20 Beav. 67, a case in its fea-
tures very similar to the present, Sir Samuel Romilly, Master of
the Rolls, employs this language: "Two things are essential to
constitute a settled and concluded election by any person who
takes an interest under a will which disposes of property belong-
ing to that person.   * * *   In this case I think that the widow
was aware of what her rights were ; she was fully aware of the
contents of her husband's. will; she was the sole executrix named
in it, and had proved it, and she made use of her character as
executrix to enforce payment of money due to her late husband
and to arrange with the landlord for the surrender of the five
lease-holds." Now apply the rule to the facts of the present
case. The will itself provides a specific fund for the payment of
the admitted debt due the executrix, and this to be in discharge.
There is also a money or bond legacy given of $3,700; and also
the residue of the testator's estate. With the information thus
furnished, she proceeds to prove the will and to execute its
trusts. She has sold some devised real estate, and assumed gen-
erally to manage the estate under the authority thus derived. Is
not this a manifest election to take under the will? An error as
to the legal consequence of the act of election is not a material

element in its validity. It is enough that she chose to accept the provisions made in her behalf.

Her mistaken supposition that she could do this and at the same time subvert some of the terms of the instrument in asserting a right as creditor, does not in any respect change the act as an election, with its consequences, and by it she must abide. There is no error in the conclusion of the referee, and the sustaining ruling of the court, that the executrix having voluntrily accepted the provisions of the will and undertaken to give them full effect, is bound by her election.

11. The second exception to the ruling of the court, which charges the executrix with the full nominal amount of the Miller debt, instead of what she was able to collect from it, must be sustained. The rules of fiduciary duty have been so distinctly announced in past adjudications, some of them very recent, that it is not necessary to prolong the discussion on this point. The requirement is that such fiduciary act "in good faith and reasonable care" in the management of the trust fund. *Deberry* v. *Ivey*, 2 Jones Eq., 370; *Nelson* v. *Hall*, 5 Jones Eq., 32; *Patterson* v. *Wadsworth*, 89 N. C., 407; *Torrence* v. *Davidson*, *ante*, 437, and other cases.

We shall not recall the efforts made and set out in the report to secure this fund to the estate in its entirety, nor the causes of the loss of a part of it, in none of which is there shown any want of care or dereliction in fiduciary duty. The only ground we can find for the decision of the court, reversing that of the referee, is furnished in the taking of the renewed obligation in the name of the executrix without declaring the attaching trusts, this being deemed a conversion and appropriation of the debt to her personal use. There are authorities that so declare the rule to be at law, and in the absence of explanations, it may be correct. But to call an exchange of an inferior into a superior and better security, preserved for the estate, a devastavit in itself, involves a perversion of the meaning of the term.

The literal rendering of the word is, "he has wasted," and implies, "a wasting of the assets," that is, that there has been a mismanagement of the estate and effects of the deceased, in squandering and misapplying the assets, contrary to the duty imposed, as explained in 2 *Williams' Ex'rs*, 1629, and in other works on the same subject. The rule has undergone qualifications, and is no longer enforced in its former rigor. "The English authorities," in the words of a recent writer, " establish that at the old law, if the legal representative releases a debt due the decedent, or delivers up, or cancels a bond, in which the deceased was named obligee, or *takes a new obligation expressed to himself* personally, or settles a suit upon consideration, he shall be, *prima facie* at least, chargeable as for a devastavit for the full consideration, on the theory that unless he could produce such consideration in full, he must have wasted it to the disadvantage of the estate." *Schuler on Ex'rs and Adm'rs*, sec. 388.

And so Mr. Iredell declares that where the executor delivered up a bond due to his testator, and took a new bond with surety to himself for the debt, it was held that this, *though a conversion in law,* was none in equity. *Iredell on Executors*, 613. This is so declared in *Armitage* v. *Metcalf*, 1 Ch., Cas. 74. The identity of the debt remains and may be pursued and held as part of the estate of the deceased, one only of the badges of ownership being removed, and that with no fraudulent or improper purpose, but under an honest impression produced by legal advice, that the fund was at her disposal.

To hold her, under such circumstances, responsible for more than she was able to obtain, after efforts put forth to secure the whole debt, would be the application of a harsh and oppressive rule of trust duty, to which we cannot consent. She is liable for all received, and this is, in our opinion, the full measure of her official obligation. We, therefore, find error in the ruling of the Court upon this exception, and re-instate the conclusion arrived at by the referee. The will, in a marked manner, indicates the purpose of the testator to deal justly and fairly with his wife

and children in the distribution of his estate among them, and is in keeping with the rule that controlled his conduct in life. But the disastrous results of the war, upon which the country was about to embark when he committed his testamentary intentions to writing, has disappointed them and left but a part to go to his survivors, and hence the embarrassments encountered in carrying out his purpose.

There is error in the ruling last considered, and the account, in this particular, must be returned to the condition in which it was originally reported. Let this be certified for further proceedings in the Court below.

*It is so ordered.*